**MINNEAPOLIS EMPLOYEES
RETIREMENT FUND, et
al., Respondents,**

v.

**ALLISON–WILLIAMS COMPANY,
et al., Petitioners, Appellants.**

No. C6–93–844.

Supreme Court of Minnesota.

June 30, 1994.

Terrance J. Fleming and Randy G. Gullickson, Lindquist & Vennum, Minneapolis, for appellants.

James B. Lynch, J. Thomas Vitt and David Ranheim, Dorsey & Whitney, Minneapolis, for respondents.

## OPINION

TOMLJANOVICH, Justice.

At issue is whether the district court properly granted summary judgment to appellants Allison–Williams and Robert Tengdin on claims by respondent Minneapolis Employees Retirement Fund ("MERF") that appellants violated the Minnesota Securities Act and were negligent in connection with the sale of securities to MERF.[1] The court of appeals held that material issues of fact precluded entry of summary judgment on both claims, 508 N.W.2d 805. We reverse the court of appeals and reinstate summary

---

1. Robert Tengdin is sued in his capacity as a director, officer, and agent of Allison–Williams for actions taken in those capacities. Unless otherwise indicated, references to Allison–Williams include Tengdin in his capacity as a director, officer, and agent of Allison–Williams.

judgment in favor of Allison–Williams and Robert Tengdin.[2]

MERF is a pension fund for retired employees of Minneapolis and for present employees hired before 1978. It is a public corporation formed pursuant to Minn.Stat. §§ 422A.01–.26 (1990). As of June 1990 MERF had an investment portfolio in excess of $800 million.

Overall responsibility for MERF's investment policies and activities is held by a Retirement Board, comprised of the Minneapolis Mayor, one city council member, and five legally qualified voters. Minn.Stat. § 422A.02. The members of the Retirement Board are the "trustees" and "custodians" of MERF funds and "have exclusive control and management of these funds." Minn.Stat. § 422A.05, subd. 1. The Retirement Board is directed by statute to appoint an Executive Director. The Executive Director is responsible for carrying out the policies of the board and otherwise administering the fund. Minn.Stat. § 422A.03. By statute, the members of the Retirement Board, MERF's Executive Director, and the Board's staff are charged with the duty to "act in good faith" and to:

> exercise that degree of judgment and care, under the circumstances then prevailing, which persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation, but for investment, considering the probable safety of their capital as well as the probable income to be derived therefrom.

Minn.Stat. § 422A.05, subd. 2a.

From 1979 until May 1990, John Chenoweth was the Executive Director of MERF. Chenoweth had primary responsibility for MERF's in-house bond portfolio and had authority to engage in securities transactions for MERF. Chenoweth was also authorized to communicate MERF's investment objectives to other brokers. Chenoweth was fatally shot on August 10, 1991.

Allison–Williams is a licensed securities broker-dealer engaged in the purchase and sale of securities in the secondary market for private placement. Generally, these securities are in the nature of corporate debt obligations or bonds. Allison–Williams deals in these securities only with institutional investors like MERF. Annually, Allison–Williams engages in transactions with around 100 institutional investors, including many pension funds. The transactions between Allison–Williams and its institutional clients usually involve the purchase or sale of a block of securities worth hundreds of thousands, or even millions, of dollars. Robert Tengdin is the Chairman of the Board of Directors and an employee of Allison–Williams.

From about 1981 until 1990, MERF purchased tens of millions of dollars worth of high-yield, high-risk bonds from Allison–Williams. Chenoweth represented MERF in these transactions, and Tengdin represented Allison–Williams.

Tengdin first met with Chenoweth in the early 1980s. They had extensive discussions in which Chenoweth described MERF's investment objectives. Chenoweth was critical of the low returns previously generated by MERF's portfolio and expressed interest in obtaining greater returns by buying privately placed securities. Tengdin advised Chenoweth about purchasing bonds, and Chenoweth sometimes but not always followed his advice. Chenoweth stated that he "had to say no 20 times for every one time I said yes" in response to Tengdin's recommendations.

Allison–Williams did not exercise discretion over MERF's investments. Allison–Williams had no authority to enter into transactions on MERF's behalf without MERF's advance, express authorization. Chenoweth expressly approved in advance the purchase of every security sold MERF by Allison–Williams.

MERF never disclosed to Allison–Williams the other investments it purchased from or

---

**2.** We reinstate the district court's grant of summary judgment to Allison–Williams on MERF's claim that Allison–Williams violated the Securities Act by recommending unsuitable securities. The court of appeals also found there to be a material factual dispute as to whether Allison– Williams violated the Securities Act by charging excessive mark-ups, and reversed the district court's denial of MERF's motion to amend its complaint to add an excessive mark-up claim. We were not asked to review this determination.

through the numerous other broker-dealers with whom MERF dealt, or MERF's direct investments. MERF never requested that Allison–Williams review, analyze, or make recommendations with respect to its overall investment strategy or portfolio. Allison–Williams never provided MERF with any such review, analysis, or recommendation.

In June 1991, MERF sued Allison–Williams to recover losses incurred as a result of transactions with Allison–Williams.[3] In its complaint, MERF specifically alleged that Allison–Williams breached a fiduciary duty to MERF, was negligent, and violated the Securities Act by selling unsuitable investments and failing to disclose material facts to MERF.

Allison–Williams moved for summary judgment on MERF's claims and requested attorney fees under Rule 11. On March 4, 1992, MERF moved to amend its complaint to add an excessive mark-up claim, as well as claims for common law fraud and violation of the Consumer Fraud Act.

On June 23, 1992, the district court granted Allison–Williams' motion for summary judgment on all three claims in the complaint, denied MERF's motion to amend, and granted Allison–Williams' motion for attorney fees under Rule 11. MERF subsequently brought a motion for reconsideration. After considering new evidence, including expert affidavits submitted with the motion, the district court declined to vacate its original order, found the new evidence to be untimely, and entered its June 23, 1992 order as final.

In an opinion filed November 23, 1993, the court of appeals affirmed in part and reversed in part. The court of appeals affirmed summary judgment on MERF's breach of fiduciary duty claim, but reversed

the trial court's grant of summary judgment on MERF's unsuitability claim. The court of appeals also reversed the district court's denial of MERF's motion to amend its complaint to add an excessive mark-up claim, and reversed the award of Rule 11 sanctions against MERF. Allison–Williams sought further review of those portions of the court of appeals opinion reversing summary judgment on MERF's negligence and unsuitability claims. MERF sought further review of the portion of the opinion affirming summary judgment with respect to MERF's breach of fiduciary duty claim. This court granted Allison–Williams petition for review and denied MERF's.

### I.

We consider first whether the district court properly granted summary judgment for Allison–Williams with respect to MERF's claim that Allison–Williams violated the Minnesota Securities Act, Minn.Stat. §§ 80A.01 to 80A.31 (1990), by recommending the sale of unsuitable securities.

The Minnesota Securities Act is patterned after federal law. The Act is to be construed so as "to coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation." Minn.Stat. § 80A.31. Federal case law is of considerable value in deciding issues arising under the Act. *Foley v. Allard,* 427 N.W.2d 647, 650 (Minn.1988).

Minn.Stat. § 80A.01 is Minnesota's counterpart to federal Rule 10b–5, 17 C.F.R. § 240.10b–5 (promulgated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988)), and to section 17(a) of the Federal Securities Act of 1933, 15 U.S.C. § 77q(a) (1988).[4] Federal courts have recognized that a broker-dealer may be liable under Rule 10b–5 where the dealer recom-

---

3. In its complaint and in response to interrogatories, MERF identifies fourteen transactions with Allison–Williams that allegedly provide a basis for this lawsuit. The total cost of the securities purchased in these transactions is approximately seven percent of MERF's overall portfolio.

4. Minn.Stat. § 80A.01 provides:
   It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;
(b) to make any untrue statement of a material fact or to omit to state material facts necessary to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

mends the purchase of securities unsuitable for the buyer's investment needs. *See, e.g., O'Connor v. R.F. Lafferty & Co., Inc.,* 965 F.2d 893 (10th Cir.1992); *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594 (2d Cir. 1978). In *O'Connor,* the Tenth Circuit held that to establish an unsuitability claim based on fraud, a plaintiff must prove three elements: (1) that a "broker recommended (or in the case of a discretionary account purchased) securities which are unsuitable in light of the investor's objectives," (2) that "the broker recommended or purchased securities with an intent to defraud or with reckless disregard for the investor's interests," and (3) that "the broker exercised control over the investor's account." 965 F.2d at 898.

For unsuitability claims brought under Minn.Stat. § 80A.01, administrative rules promulgated by the Minnesota Commissioner of Commerce further define the contours of broker liability. In particular, Minn.R. § 2875.0910, subp. 2 (1991) provides:

> **Recommendations to customers:** In recommending to a customer the purchase, sale, or exchange of any security, a broker-dealer shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts disclosed by such customer as to his financial situation and needs.

> A broker-dealer may not recommend speculative, low-priced securities to customers without knowledge or an attempt to obtain information concerning the customers' other securities holdings, their financial situation, and other necessary data.

MERF premises its unsuitability claim here on two separate grounds. First, MERF alleges generally that Allison–Williams violated Minn.Stat. § 80A.01 because the high-yield bonds it recommended were unsuitable in light of MERF's objectives. Second, MERF alleges more particularly that Allison–Williams breached a duty arising under Minn.R. § 2875.0910, subp. 2 to obtain information concerning MERF's financial situation before recommending the sale of speculative securities.

We assess MERF's general unsuitability claim under Minn.Stat. § 80A.01 by applying the Tenth Circuit's approach to claims brought under Rule 10b–5 which is set forth in *O'Connor,* 965 F.2d 893. Applying the *O'Connor* standard, to establish an unsuitability claim MERF must prove (1) that the securities recommended by Allison–Williams were unsuitable in light of MERF's investment objectives, (2) that Allison–Williams acted with an intent to defraud or with reckless disregard of MERF's interest, and (3) that Allison–Williams exercised control over MERF's account.

MERF alleges the high-yield, high-risk bonds sold by Allison–Williams were inconsistent with MERF's investment objectives. MERF, however, has presented no evidence that Allison–Williams recommended any security inconsistent with the investment objectives identified by Chenoweth, the Executive Director of MERF. *See* Minn.R. § 2875.-0910, subp. 2 (stating a "broker-dealer shall have reasonable grounds for believing that the recommendation is suitable for such customer *upon the basis of the facts disclosed by such customer as to financial situation and needs.*" (emphasis added)). Chenoweth informed Tengdin, representing Allison–Williams, that he was interested in obtaining greater returns by buying privately placed securities. The purchase or sale of a high-yield speculative bond by an institutional investor such as a pension fund is a common transaction.[5] Consequently, while MERF and Chenoweth may have violated a fiduciary duty to invest in a prudent manner by over-investing in speculative private placement bonds, we agree with the district court that MERF's transactions with Allison–Williams were consistent with MERF's investment objectives and financial situation as disclosed by MERF to Allison–Williams.

With respect to the second element of the *O'Connor* test, MERF has not produced substantial evidence tending to show fraudulent

---

**5.** A Securities and Exchange Commission study found that pension funds comprise about 11 to 14 percent of the participants in the $200 billion market for high yield securities such as those sold to MERF by Allison–Williams. Division of Market Regulation, U.S. Securities and Exchange Commission, *The Corporate Bond Markets: Structure, Pricing and Trading* 5 (1992).

intent or reckless disregard on the part of Allison–Williams. Chenoweth was authorized to communicate MERF's investment objectives, and there is no evidence that Allison–Williams recommended a security inconsistent with the objectives identified by Chenoweth.

■ MERF claims a showing of fraudulent intent or recklessness should not be required for unsuitability claims brought under the Minnesota Securities Act. MERF points out Minn.Stat. §§ 80A.01(b) and 80.-01(c) may in some instances proscribe negligent as well as intentional misconduct. *See Aaron v. Securities and Exchange Comm'n,* 446 U.S. 680, 695–97, 100 S.Ct. 1945, 1954–56, 64 L.Ed.2d 611 (1980) (holding scienter is not required under sections 17(a)(2) or (a)(3) of Securities Act of 1933, even though scienter is required for all claims brought under Rule 10b–5); *Sprangers v. Interactive Technologies, Inc.,* 394 N.W.2d 498, 503 (Minn.App. 1986), *pet. for rev. denied* (Minn. November 19, 1986) (recognizing seller of stock may be liable for misrepresentation irrespective of scienter).

■ We believe unsuitability claims brought under the Minnesota Securities Act should be treated similarly to unsuitability claims brought under federal Rule 10b–5. As stated by the Colorado Supreme Court in *Boettcher & Co., Inc. v. Munson,* 854 P.2d 199, 209 (Colo.1993):

> The gravamen of a fraud claim premised on unsuitability is that a broker recommended an investment to an investor while knowing, or reasonably believing, that the investment was not suited to the investor's needs.

We are unaware of any court decision under federal or state securities law which has ever recognized an unsuitability claim without requiring a showing of fraudulent intent or recklessness.

With respect to the third element of the *O'Connor* test, MERF has failed to present substantial evidence that Allison–Williams exercised control over MERF's account. Allison–Williams had no authority to enter into transactions on MERF's behalf without MERF's advance, express authorization. Chenoweth expressly approved in advance the purchase of every security sold to MERF by Allison–Williams.

■ We conclude MERF has no general unsuitability claim under Minn.Stat. § 80A.01. We turn to MERF's alleged basis for recovery under Minn.R. § 2875.0910, subp. 2 (1991). The court of appeals found that MERF had raised a genuine issue of fact as to whether Allison–Williams complied with the second paragraph of this rule. Under the second paragraph, a broker-dealer may have a duty to obtain information concerning a customer's financial situation and other security holdings where the broker-dealer recommends "speculative, low-priced" securities. It is undisputed the private placement securities sold by Allison–Williams to MERF were speculative in nature. The securities sold, however, ranged in price from hundreds of thousands to millions of dollars. Therefore, they were certainly not "low-priced" in terms of market value.

MERF contends that a "low-priced" bond in this context is one that is sold at a discount from par or face value.[6] We disagree. The second paragraph of Minn.R. § 2875.-0910, subp. 2 (1991) is virtually identical to, and is apparently based on, the National Association of Security Dealers' (NASD) interpretation of its own suitability rule. The NASD adopted this interpretation of its suitability rule in the 1960s in response to a study by the Securities and Exchange Commission focusing on abusive sales practices by dealers in "penny stocks" (an unofficial term for securities trading for under $5). Penny stocks are often referred to as "low-priced securities," the precise phrase used in Minn.R. § 2875.0910, subp. 2. *See S.E.C. v. Kimmes,* 759 F.Supp. 430, 431 (N.D.Ill.1991) (referring to penny stocks as "low-priced securities"); 17 C.F.R. 240.15g–9 (referring to penny stocks as "low-priced securities"); Black's Law Dictionary (defining penny stocks as "low priced" issues).

---

**6.** The "par value" or "face value" is the redemption value of the bond appearing on the face of the certificate.

■ We agree with Allison–Williams that the second paragraph of Minn.R. § 2875.0910, subp. 2, was never intended to apply to sophisticated institutional investors like MERF, which as of June 1990 had an investment portfolio in excess of $800 million. In official proceedings at the time the rule was adopted, the State Commissioner of Securities found that the rule was needed "to protect *unsophisticated* investors from agents or broker-dealers in whom they misplace their trust." *In the Matter of the Proposed Adoption of Rules of the State Securities Division of the Department of Commerce Governing Securities; Under Minnesota Laws, 1973, Chapter 451* (1974) (emphasis added). It is unlikely that a sophisticated institutional investor would be willing to provide information regarding all of its security holdings to a broker-dealer. Interpreting the second paragraph of Minn.R. § 2875.0910, subp. 2, to apply to institutional investors would open the door to lawsuits by such investors against their brokers, on the basis that the brokers failed to acquire sufficient information about the investor, every time the investor lost money on an investment.

■ We conclude that within the meaning of Minn.R. § 2875.0910, subp. 2, a "low-priced" security is one that is low in market value. The second paragraph of Minn.R. § 2875.0910 has no application where bonds are sold for hundreds of thousands of dollars to a sophisticated institutional investor. Given the second paragraph does not apply to the transactions at issue, there is no question Allison–Williams complied with the first paragraph of the rule. We have already concluded Allison–Williams had reasonable grounds for believing its recommendations suitable "upon the basis of the facts disclosed by" MERF.

The district court properly granted summary judgment to Allison–Williams on MERF's unsuitability claim.

7. Breach of this duty may give rise to a negligence claim. A broker, of course, has other duties under the law such as the duty not to engage in fraudulent conduct. *Rude,* 296 Minn. at 519, 207 N.W.2d at 711 n. 1.

8. MERF argues that the court of appeals properly determined there to be questions of fact with

## II.

■ We next consider whether the district court properly granted summary judgment to Allison–Williams on MERF's negligence claim. The elements of a cause of action for negligence are: (1) duty; (2) breach of that duty; (3) that the breach of the duty be the proximate cause of plaintiff's injury; and (4) damages. *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 157 (Minn.1982). Duty in negligence cases may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Rasmussen v. Prudential Ins. Co.,* 277 Minn. 266, 268–69, 152 N.W.2d 359, 362 (1967). The general standard of care required by law is that degree of care which a reasonably prudent person would exercise under the same or similar circumstances. *Hartmon v. Nat'l Heater Co.,* 240 Minn. 264, 272, 60 N.W.2d 804, 810 (1953). A person practicing a profession is bound to exercise the degree of care and skill usually exercised by members of the profession under similar circumstances. *City of Eveleth v. Ruble,* 302 Minn. 249, 253, 225 N.W.2d 521, 525 (1974).

■ A broker is not a guarantor or insurer against losses sustained by her customer. *Rude v. Larson,* 296 Minn. 518, 519–520, 207 N.W.2d 709, 711 (1973). Thus, in *Rude,* we held that absent a special agreement to the contrary, a broker owes her customer only the duty to exercise due care in executing all instructions expressly given to her.[7]

■ MERF argues that Securities Act regulations prohibiting the recommendation of unsuitable securities and prohibiting the charging of excessive markups create a new standard of care for brokers, and that breach of these regulations is negligence per se.[8] We disagree.

respect to MERF's unsuitability and excessive mark-up claims. We have already determined that MERF has no unsuitability claim under Minn.Stat. § 80A.01 or under Minn.R. § 2875.0910, subp. 2. The court of appeals remanded MERF's claim that Allison–Williams charged excessive mark-ups in violation of Minn.R. § 2875.-

While violation of a statute may constitute negligence, it is within our discretion to determine whether violation of a particular statute or regulation gives rise to a negligence claim. We have held that a violation of a statute or regulation may be evidence of negligence if (1) the intent of the statute is to protect a class of which plaintiff is a member, (2) the plaintiff's injury involves an invasion of the particular interest protected by the statute, (3) the plaintiff's injury was caused by the particular hazard or form of hazard against which the enactment was designed to give protection, and (4) the injury was proximately caused by its violation. *Johnson v. Farmers and Merchants State Bank,* 320 N.W.2d 892, 897 (1982).

We believe replacing the standard of care for brokers we articulated in *Rude* is unwarranted. The particular hazard or form of hazard against which the Securities Act is designed to give protection is fraudulent conduct. The Securities Act expressly provides a buyer with a statutory cause of action where a seller violates the provisions therein. *See* Minn.Stat. § 80A.23, subd. 2.

The district court properly granted summary judgment for Allison–Williams on MERF's negligence claim.

Reversed.

0910, and we were not asked to review this